Filed 3/29/21 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DAVID S. KARTON et al.,<br><br>    Plaintiffs and Appellants,<br><br>          v.<br><br>ARI DESIGN &<br>  CONSTRUCTION, INC., et al.,<br><br>          Defendants and<br>          Respondents. | B298003<br><br>(Los Angeles County Super. Ct.<br>No. SC125392)<br><br>**ORDER MODIFYING<br>OPINION AND DENYING<br>PETITION FOR<br>REHEARING**<br><br>[NO CHANGE IN<br>JUDGMENT] |

THE COURT:

    IT IS ORDERED the opinion in the above-entitled matter
filed on March 9, 2021, be modified as follows:

1.  On page 10, in the third sentence of the second full
    paragraph, "multiplicand" is changed to "product";

2.  On page 14, the first and second sentences of the third full
    paragraph are deleted and replaced as follows:  "Weighing
    cost and benefit, this trial court concluded a fee much
    larger than the judgment was not reasonable.  This was

logical:  rational investors or buyers would not spend more than $1 to get something worth $1."

The petition for rehearing is denied.

There is no change in the judgment.

_____

BIGELOW, P. J.          GRIMES, J.          WILEY, J.

Filed 3/9/21 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DAVID S. KARTON et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ARI DESIGN & CONSTRUCTION, INC., et al., <br><br> Defendants and Respondents. | B298003 <br><br> (Los Angeles County Super. Ct. No. SC125392) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elaine W. Mandel, Judge.  Affirmed in part and reversed in part.

Law Offices of Joe R. Abramson, Joe R. Abramson; Law Offices of David S. Karton and David S. Karton for Plaintiffs and Appellants.

Ilan Messika, Jonathan Guttman and Shahar Toledano, in pro. per., for Defendants and Respondents.

Hausman & Sosa, Carlos E. Sosa and Larry D. Stratton for Defendant and Respondent Wesco Insurance Company.

————————————

Trial judges deciding motions for attorney fees properly may consider whether the attorney seeking the fee has become personally embroiled and has, therefore, over-litigated the case. Similarly, judges permissibly may consider whether an attorney's incivility in litigation has affected the litigation costs.

Here, the trial judge found attorney David Karton's fee motion triggered these concerns. Karton had a dispute with his home remodeling contractor: defendant and appellee Ari Design and Construction, Inc. At one point, their difference amounted to only $22,096: Karton said Ari owed him $35,096, while Ari contended it owed $13,000.

Karton sued Ari and won a judgment for $133,792.11 plus postjudgment interest. Karton then sought attorney fees of $271,530, which were later increased to $287,640 in the trial court and now to $292,140 in this court. The trial court awarded $90,000 in attorney fees. We affirm this award against Karton's argument that $90,000 is not enough.

On a different issue, the trial judge ruled the Kartons had no basis to collect the $90,000 award from an insurance company called Wesco that had posted a surety bond for Ari. The liability of the surety is commensurate with the liability of its principal. In this case, by statute, Ari must pay the attorney fees as a matter of costs. So too must Wesco. We reverse and remand for the trial court to amend the judgment to make surety Wesco liable for the $90,000 fee award as an item of costs.

I

Plaintiffs and appellants David and Cheryl Karton engaged Ari for $163,650 of construction work on their home. After months of work, a dispute arose and the Kartons told Ari to stop work in late 2015. At this point, the Kartons claimed Ari owed

2

them $35,096.  Ari admitted to a debt but claimed it was only $13,000.  The difference was $22,096.

In February 2016, the Kartons sued Ari, which is a business entity.  The Kartons also sued three people connected with Ari—Shahar Toledano, Jonathan Guttman, and Ilan Messika—as well as Ari's surety:  Wesco Insurance Company, which had posted a $12,500 construction bond for Ari.  The Kartons alleged five counts:  breach of contract (against all but Wesco), money had and received (against all but Wesco), violation of Business and Professions Code section 7031 (to recover compensation paid to an unlicensed contractor, against all but Wesco), license bond (against only Wesco), and unfair competition (against all but Wesco).

The court held a three-and-a-half day bench trial in November 2017.  The Kartons called seven witnesses.  The defense called no independent witnesses.

The court issued a 20-page tentative statement of decision it later adopted as its final ruling.  We excerpt the findings.

Ari began work on the Kartons' home in June 2015 and continued daily through November 2015.  During these months, Ari usually had between two and four people working on the site.  In November 2015, David Karton began to suspect there was a problem with Ari's workers' compensation insurance.  The Kartons ordered Ari to suspend work when they ascertained Ari was not properly licensed or insured.

The Kartons had paid Ari $92,651 to that point but had overpaid:  Ari had not yet done that amount of work.  Karton and Ari agreed the Kartons had overpaid but disagreed about by how much.  Karton said Ari owed $35,096; Ari said it owed only $13,000.  The court found the Kartons were right:  they had paid

3

Ari $92,651, but the contract value of Ari's work to that point was only $57,555: the Kartons thus had overpaid by $35,096.

This overpayment of $35,096, however, was not the measure of damages; rather, the Kartons were entitled to the *entire* amount they paid Ari: $92,651, plus prejudgment interest. This was despite the fact Ari's workers had performed $57,555 worth of construction work for the Kartons. No witness impugned the quality of Ari's work.

This $92,651 award was under section 7031, subdivision (b), of the Business and Professions Code, which entitles those using an unlicensed contractor to *all* compensation they paid the unlicensed contractor, even if they knew the contractor was unlicensed. This statute requires an unlicensed contractor to return all compensation it received, without reductions or offsets for the value of materials or services it provided. This statute can create a windfall for those hiring an unlicensed contractor that has done quality work. Courts may not resort to equitable considerations when applying this statute, however, for the law aims to create a harsh penalty to induce contractors to maintain proper licensure. (*Ahdout v. Hekmatjah* (2013) 213 Cal.App.4th 21, 30–31.)

To this $92,651 award against Ari, the court added an additional $10,000 penalty under Code of Civil Procedure section 1029.8. This section 1029.8 provides for treble damages and attorney fees against "[a]ny unlicensed person" whose work injures another person. This statute caps the permissible treble damages award at $10,000. (*Id*., subds. (a) & (c).) This treble damage provision, albeit capped, is an additional noncompensatory damage provision that created a further windfall for the Kartons. Together with its attorney fee

4

allowance, this statutory damage multiplier creates a supplemental incentive to maintain proper licensure. The incentive is potent to the point of having penal attributes. (*Rony v. Costa* (2012) 210 Cal.App.4th 746, 757.)

The trial court also awarded the Kartons storage fees of $2,850.

The damage award was against Ari and not against Messika, Guttman, and Toledano. The court found these three people were not Ari's alter egos.

The court awarded the Kartons $12,500 against Ari's surety Wesco on the fourth cause of action concerning the construction bond.

Although the court found Ari lacked its contractor's license and did not obtain proper insurance, the court did not find Ari's work to be defective or of poor quality.

The court entered an amended judgment on October 24, 2018, and retained jurisdiction to decide attorney fees.

The trial court later held two hearings on the issue of attorney fees. The judge who had handled the case to that point had been reassigned; a new judge heard the Kartons' attorney fee motion.

The first fee hearing was on January 25, 2019. Lawyer Shani Kochav appeared for all defendants. Lawyers Joe Abramson and David Karton appeared for the Kartons; Karton said his appearance was "limited scope representing myself and my wife." Karton argued first and did most of the speaking for the Kartons.

Before this hearing, the court issued a tentative ruling. This ruling noted the Kartons were requesting $271,530 in attorney fees, $52,021 in discovery sanctions, and $203,646 for

proving matters at trial that had been denied in discovery. This tentative ruling also noted the amended judgment made fees recoverable only against Ari and not against the individual people who were defendants. The court determined $450 an hour was a reasonable rate for Abramson and that the issues in the case were "not particularly complex." The court observed the Kartons' motion lacked a breakdown of hours spent by counsel beyond a "bare-bones declaration" that merely asserted a total of 603.4 hours and an estimate of percentages devoted to different tasks. The tentative ruling concluded the Kartons provided insufficient evidence for the court to assess whether the requested fees were reasonable. The court proposed to continue the hearing to allow the Kartons to supply the missing evidence to justify their request.

At the hearing, Karton asked for 30 days to file supplemental papers. The court granted this request. The court set a 10-page limit on the filing. Karton said, "I assume that's the text" and not the exhibits, and the court said yes.

In February 2019, the Kartons filed 11 pages of text and over 400 pages of supplemental briefing. In this filing, the Kartons "updated" their demand by adding $16,110 to their fee request. Without explicitly saying so, the Kartons suggested their initial billing figures were incorrect.

The second hearing was on March 25, 2019. Karton was the sole attorney representing the Kartons; Abramson did not appear. Karton and the court agreed the *Trope* case barred recovery for the time Karton himself had spent on the case. (See *Trope v. Katz* (1995) 11 Cal.4th 274, 292 [attorney litigants may not recover attorney fees as compensation for effort they spend litigating matters on their own behalf].)

6

Karton said the trial court's damage award against Ari was $102,000.

The court noted Karton's original request was for about $270,000 in attorney fees but the request lacked evidence "as to the number of hours spent or the tasks performed by whom, et cetera . . . ."

The court expressed surprise Karton now had increased that request "beyond what had previously been requested."

The trial court commented on the Kartons' lack of civility in their briefing. "The briefing filed by [the Kartons'] counsel was replete with attacks on defense counsel such as that defense counsel filed 'knowingly false claims of witness tampering,' 'her comments were frivolous,' something was 'typical of the improper tactics employed by defendants and their counsel'. [¶] It was really offensive to me, the attacks made in this case."

The trial court stated it had given Karton the "opportunity to revive a request that could have been denied by the court two months ago, and instead of denying it, I gave you the opportunity to file evidence. [¶] I did not expect to see a request for increased fees, and I did not expect to see these kind[s] of improper attacks on counsel in your briefing."

The court said Karton and his cocounsel "filed a lot of papers, several hundred pages worth of documents, of block billing, given the fact that you were told by the court to file documents with a 10-page limit. Again, I was surprised to find, oh, 300 pages of documents filed. [¶] I assumed that you would give me billing records, and you have, but I also have a lot of extraneous documentation, a lot of paper that I did not need and did not want in ruling on this motion. [¶] If this is reflective of the litigation that went on in this relatively simple-sounding

7

case, I understand how you may and your counsel may have spent the number of hours that you claim to have spent."

The court observed the Kartons had gone "so far beyond what was necessary on this matter."

The court concluded, "I cannot say that anything like $270,000 requested in this case is reasonable." The $270,000 fee request was "excessive by a lot."

Karton said, "I'm sorry that you feel that I have offended the court." He continued, "I'm facing a situation where a judge ruled that the other side completely cheated. They claimed—they claimed that they were insured, and they weren't." The court agreed: "That's what Judge Newman found."

The court observed Karton was "agitated about this case. This is your personal matter, and I understand that. I see that you have strong feelings about this case and strong feelings about the course of this litigation and how it has proceeded."

The court asked Karton, "Can you not interrupt me. I would appreciate your letting me finish my sentence." Karton apologized.

The court stated that what Karton had "presented here went vastly beyond what I anticipated." The court noted the additional 20 exhibits the Kartons attached to their supplemental 10-page brief "is emblematic to me of the over-litigation of this case." "[T]his was reflective of the amount of time that was spent on various tasks throughout the course of this litigation."

The court took the matter under submission.

The next day the court issued a minute order approving 200 hours at $450 per hour, for a total fee of $90,000. The order noted the court had given Karton leave to file supplemental briefing of 10 pages but that Karton had filed hundreds of pages

with 20 or more additional exhibits—an effort Karton claimed took 30 hours of attorney time.  Karton's supplemental briefing increased the size of his fee request.  The order reviewed law about the lodestar method of fee calculation and noted its broad discretion to adjust an award downward or to deny it completely if it determined a request was excessive, citing *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*).  (See also *id*. at p. 1138 ["To the extent a trial court is concerned that a particular award is excessive, it has broad discretion to adjust the fee downward or deny an unreasonable fee altogether."].)

The order noted the "inflammatory language" in Karton's briefing.  The court reiterated the Kartons' supplemental briefing "vastly exceeded" the scope of the court's order and was "emblematic of the vast over-litigating of this matter."  "In its discretion, the court finds that 200 hours at $450/hour ($90,000)" was a reasonable attorney fee for the Kartons.  "The issues of this case do not appear particularly complex, and the request for fees is vastly in excess of what is reasonable.  Fees three times the award [do] not seem to be reasonable, nor [do] 600 hours of attorney time."

On a separate issue, the court ruled the Kartons had no statutory or contractual basis for a recovery of attorney fees against Wesco.

The Kartons appealed.

## II

We reject the Kartons' complaint that the $90,000 attorney fee award is too small.

## A

We review attorney fee awards for abuse of discretion.  An experienced trial judge is in the best position to evaluate the

9

value of professional services rendered in the trial court. We presume the fee approved by the trial court is reasonable. We will not disturb the trial court's judgment unless it is clearly wrong. The burden is on the objector to show error. (*Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 488 (*Laffitte*).) Equitable principles inform this project. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM*).)

The benchmark in determining attorney fees is reasonableness. Courts have developed two ways to define a reasonable fee.

The first method is the lodestar approach. This method traces back at least to the famous *Lindy* case: *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.* (3d Cir. 1973) 487 F.2d 161, 168. The lodestar is the multiplicand of a reasonable hourly rate and a reasonable number of hours. (*PLCM*, *supra*, 22 Cal.4th at p. 1095.) The court then may adjust the lodestar based on a variety of factors. Germane factors include the nature, difficulty, and extent of the litigation, the skill it required, the attention given, and the success or failure of the enterprise, as well as other factors. (*Id.* at p. 1096.) Whether the attorney worked on a contingency is relevant. (*Mikhaeilpoor v. BMW of North America, LLC* (2020) 48 Cal.App.5th 240, 248 (*Mikhaeilpoor*).) A trial court is not required to state each charge it finds reasonable or unreasonable. A reduced award might be fully justified by a general observation that an attorney over-litigated a case. (*Id.* at p. 250.)

The second method is the percentage-of-recovery approach. The percentage approach arose in the class action context and predated the lodestar method, but has always shared the lodestar method's fundamental goal of defining "reasonableness" in a

10

given case.  (E.g., *Laffitte*, *supra*, 1 Cal.5th at p. 504 [the goal under both the percentage and lodestar approach is the award of a reasonable fee to compensate counsel for their efforts].)

Over the decades, there has been a nationwide tug-of-war about which method is superior:  lodestar versus percentage. (*Laffitte*, *supra*, 1 Cal.5th at pp. 489–503.)  Each approach has advantages and disadvantages.  The lodestar method better accounts for the amount of work done, while the percentage approach more accurately reflects the results achieved.  (*Id.* at p. 489.)

In 2010, the American Law Institute concluded " 'most courts and commentators now believe that the percentage method is superior.  Critics of the lodestar method note, for example, the difficulty in applying the method and cite the undesirable incentives created by that approach—i.e., a financial incentive to extend the litigation so that the attorneys can accrue additional hours (and thus, additional fees).' " (*Laffitte*, *supra*, 1 Cal.5th at p. 494, quoting ALI, Principles of the Law of Aggregate Litigation (2010) § 3.13, com. b.)

Attorneys can be prone to opportunistic opinions on which approach they prefer, depending on the circumstances of their case.  The reason is obvious:  money.

If the recovery is large, plaintiffs' counsel can favor the percentage approach, because a percentage of a very large number itself can be large.  (E.g., *Augustus v. ABM Security Services, Inc.* (2016) 2 Cal.5th 257, 260 ["trial court granted summary judgment for plaintiffs, finding ABM liable and awarding approximately $90 million"]; *Augustus v. American Commercial Security Services* (L.A.Super.Ct., June 30, 2017, No. BC336416) 2017 WL 11417614 [attorney fee award of over 30

11

percent of that sum].) Correspondingly, defense counsel in such cases can be articulate as to why a percentage approach is misguided.

If the recovery is comparatively slight, both sides can reverse field, with plaintiffs' counsel insisting the lodestar approach must dominate and defense counsel praising the virtues of the percentage method.

Our Supreme Court has concluded that, in common fund cases, trial courts have discretion to begin with a percentage approach and then to use the lodestar approach to cross-check the reasonableness of the percentage. (*Laffitte*, *supra*, 1 Cal.5th at pp. 503–506.) The court has stressed it has not mandated a blanket "lodestar only" approach. (*Id.* at p. 500; see also *id.* at p. 503.)

The Supreme Court also has approved the trial court's discretion to use a positive or negative multiplier to adjust the lodestar sum. (E.g., *Laffitte*, *supra*, 1 Cal.5th at p. 505.) Use of a multiplier can affect the final award considerably: it can double or treble the beginning figure, or more, and can reduce it drastically too. No established criteria calibrate the precise size and direction of the multiplier, thus implying considerable deference to trial court decisionmaking about attorney fee awards.

B

The trial court used sound discretion to limit the Kartons' attorney fees to $90,000.

The court began with the conventional lodestar calculation: a reasonable hourly rate times a reasonable number of hours. The rate is undisputed. On hours, the Kartons said their attorney devoted more than 600 hours to this litigation. The

12

court did not doubt it, but thought the hours were "excessive by a lot."

The court gave five good reasons for concluding 600 plus hours was unreasonable.

First, the trial court rightly found the questions in this case were relatively simple. Difficult issues require more attorney hours. (*Ketchum*, *supra*, 24 Cal.4th at p. 1138.) Simpler questions require fewer. Here the issues were pedestrian: whether a contractor had insurance and a license. On the issue of how much Ari owed the Kartons, Cheryl Karton testified Ari owed $35,096, and "[t]his testimony was not controverted by the Defendants." In the realm of civil litigation in California, this case was relatively straightforward.

Second, the court had an ample basis to conclude the Kartons over-litigated this matter. They had about a $23,000 dispute with their contractor: the Kartons had said Ari owed $35,096 and Ari had claimed the debt was only $13,000. A $23,000 argument must be resolved, but it does not justify launching a disproportionate litigation offensive. The Kartons' strategy netted them windfall gains: the harshness of contractor licensing laws allowed them to recoup all their construction monies, plus $10,000, and to retain the benefit of months of free construction work. Notwithstanding this windfall, this remained a small case in the range of civil matters in the Los Angeles Superior Court. The trial court did not abuse its discretion by acknowledging this salient point.

Third, the trial court fairly attributed some of the over-litigation to Karton's personal embroilment in the matter. Karton is an experienced lawyer. He brought this suit about his own home. Karton declared, "I was substantially involved in this

13

case because I was cheated.  So, yes, I was involved."  The trial court observed Karton's demeanor at the hearings and saw he was "agitated about this case.  This is your personal matter, and I understand that.  I see that you have strong feelings about this case and strong feelings about the course of this litigation and how it has proceeded."  The court had reason to conclude embroilment undermined objectivity about the appropriate scale of litigation.

Fourth, the trial court rightly sought an appropriate relationship between the result achieved and the size of the fee. For a century or more, California courts have considered the success or failure of attorney efforts when evaluating attorney fee requests.  (E.g., *Grass v. Rindge Co.* (1927) 84 Cal.App. 750, 767; *Mikhaeilpoor*, *supra*, 48 Cal.App.5th at p. 247.)

The size of a judgment is pertinent to rational evaluation of a requested fee.  Rational decisionmaking weighs benefits and costs.  The judgment measures the dollar benefit of the litigation. The attorney fee is the cost of obtaining that benefit.  This was strictly a money judgment; there was no injunctive or equitable relief of an intangible value.  The dollar and cents precisely quantified the benefit to the Kartons.

Weighing cost and benefit, this trial court concluded a fee three times the judgment was not reasonable.  This was logical: rational investors or buyers would not spend $3 to get something worth $1.  The trial court properly connected the fee to the judgment.

Fifth, the court correctly noted the incivility in Karton's briefing.  Attorney skill is a traditional touchstone for deciding whether to adjust a lodestar.  (*Ketchum*, *supra*, 24 Cal.4th at p. 1132.)  Civility is an aspect of skill.

14

Excellent lawyers deserve higher fees, and excellent lawyers are civil. Sound logic and bitter experience support these points.

Civility is an ethical component of professionalism. Civility is desirable in litigation, not only because it is ethically required for its own sake, but also because it is socially advantageous: it lowers the costs of dispute resolution. The American legal profession exists to help people resolve disputes cheaply, swiftly, fairly, and justly. Incivility between counsel is sand in the gears.

Incivility can rankle relations and thereby increase the friction, extent, and cost of litigation. Calling opposing counsel a liar, for instance, can invite destructive reciprocity and generate needless controversies. Seasoning a disagreement with avoidable irritants can turn a minor conflict into a costly and protracted war. All those human hours, which could have been put to socially productive uses, instead are devoted to the unnecessary war and are lost forever. All sides lose, as does the justice system, which must supervise the hostilities.

By contrast, civility in litigation tends to be efficient by allowing disputants to focus on core disagreements and to minimize tangential distractions. It is a salutary incentive for counsel in fee-shifting cases to know their own low blows may return to hit them in the pocketbook.

This trial court appropriately voiced this concern. (Cf. *Briganti v. Chow* (2019) 42 Cal.App.5th 504, 511 [citing authority about "the larger scourge of incivility afflicting law practice"]; *id.* at pp. 511–512 [judges should help reduce incivility].)

The Kartons respond to criticism of their personal attacks by attacking.

First the Kartons maintain opposing counsel indeed did knowingly make false statements. They point to a report by a discovery referee. The cited pages, however, recount the parties stipulated certain evidence would be inadmissible. They do not find someone knowingly made false statements. In oral argument on appeal, however, Karton continued to assert opposing counsel was a liar.

Next the Kartons defend calling opposing counsel's comments "frivolous." They claim a meet and confer letter was so meritless as to justify this language. The Kartons do not, however, cite a finding faulting this supposedly meritless letter.

On this point, the Kartons quote the Phil Spector murder case at some length, to no avail. There, in closing argument a prosecutor told a jury that expert witnesses will say anything if you pay them enough. (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1404 (*Spector*).) This case is irrelevant. *Spector* involved neither an attack on opposing counsel's integrity nor appropriate factors in setting an attorney fee award. (*Id.* at p. 1406.) Instead, it involved a closing argument about an expert witness jurors had to evaluate.

Finally, the trial court noted the Kartons denigrated the actions of opposing counsel as "typical of the improper tactics employed by defendants and their counsel." The Kartons argue "this characterization falls within the scope of the type of advocacy approved in *People v. Spector* . . . ." The *Spector* case did not involve attacks on the integrity of opposing counsel. (*Spector*, *supra*, 194 Cal.App.4th at p. 1406.) This argument fails.

In short, in this appeal the Kartons have come out swinging, apparently believing the best defense is a good offense.

This approach demonstrates the trial court was within its discretion to conclude the Kartons conducted litigation that was less than civil.

In sum, these five grounds were sound bases for reducing the requested attorney fee from about $300,000 to $90,000.

The Kartons raise other objections to the reduction. They argue the trial court abused its discretion by comparing the size of the fee request to the size of judgment. The Kartons offer no authority for this assertion, which is contrary to the case law noted above. (E.g., *Laffitte*, *supra*, 1 Cal. 5th at p. 503 ["the percentage method is a valuable tool that should not be denied our trial courts"]; see also *id.* at p. 504.) It is logical and customary to compare cost to benefit.

The Kartons say the trial court failed to consider materials they included with their supplemental brief. The record is to the contrary. The trial court referred to the Kartons' papers during the hearing and based part of its ruling on those documents. The court's written order also referred to these materials.

The Kartons cite *Stokus v. Marsh* (1990) 217 Cal.App.3d 647 (*Stokus*). That case supports Ari and the trial court, not the Kartons. In *Stokus*, a jury in an unlawful detainer action awarded possession of real property and $6,166 in damages to the plaintiff landlord. The trial court awarded this landlord $75,000 in attorney fees. (*Id.* at p. 651.) The appellate court affirmed this award because the defense had "tenaciously over-litigated" the case. (*Id.* at p. 653 & fn. 3.) The *Stokus* opinion penalized over-litigation. So did this trial court.

The Kartons cite *Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, which also supports this trial court's order. In contrast to this case, the trial court in *Gorman* issued

17

no tentative rulings on the fee motion. During the hearing the court asked no questions and expressed no views. The court took the matter under submission, and then issued a Delphic order cutting the fee request to $416,581.37. Note the 37 cents. The court did not explain its ruling. (*Id*. at pp. 53, 56–57.) The precision of this mystifying order implied some deep logic the appellate court struggled to uncover but failed to find. Unable to surmise a reasonable explanation, the appellate court concluded the order was merely arbitrary. (*Id*. at pp. 53 & 100–101.) There was no such veiled trial court conduct here. Rather, this trial court issued a tentative ruling, stated its views during two hearings, and in its written order repeated the same reasoning, which is cogent and consistent. *Gorman* shows one wrong way for a trial court to rule on fees. This trial court showed one right way.

As an alternate basis for their request of their fee request, the Kartons fault the trial court for failing to impose monetary discovery sanctions against all defendants, including Wesco. We review a trial court's decision to impose terminating sanctions for abuse of discretion, drawing all reasonable inferences in support of the court's ruling. (*Padron v. Watchtower Bible & Tract Society of New York, Inc.* (2017) 16 Cal.App.5th 1246, 1260.)

The Kartons point to a May 2017 report from a discovery referee as the basis for their sanction request. With our italics, this report recommended the possibility of *future* sanctions "in the event of any further non-compliance . . . ." There is, however, no later finding of further non-compliance.

On appeal, the Kartons have not cited record evidence to show they moved for discovery sanctions between this May 2017 report and the November 2017 trial. The trial court thus was

18

justified in concluding that pretrial discovery disputes were stale and that posttrial motions on the topic were tardy. We imply this determination in support of the order and do not upset it.

In support of their sanctions argument, the Kartons cite the inapposite cases of *Doppes* and *London*.

*Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967 is a memorable case about an expensive luxury car that smelled bad. A car buyer sued Bentley about a persistent interior odor that Bentley, despite many efforts, could not eliminate. In pretrial litigation, Bentley claimed to be unaware of an odor problem with this model. Then it came out Bentley knew perfectly well a wax on this model routinely created this odor problem. Bentley even had given its dealers an "Odour Reduction" procedure to combat the recurrent smell problem. The extent of Bentley's discovery abuse did not emerge until trial, at which point the car buyer renewed its motion for discovery sanctions. (*Id.* at pp. 971–986, 993–994.) The motion in *Doppes* was timely. The motion here was not.

*London v. Dri-Honing Corp.* (2004) 117 Cal.App.4th 999, 1008–1009 stressed the importance of timeliness for motions for monetary sanctions. The Kartons' motion was untimely.

The trial court thus correctly denied the Kartons' sanctions motion as untimely.

Additionally, the Kartons seek to offer an alternative basis for their attorney fee request, which is a cost-of-proof theory. The Kartons correctly acknowledge they are not entitled to duplicative fees. Their alternative recovery theory, however, likewise requires a finding the requested fees are reasonable. (Code Civ. Proc., § 2033.420, subd. (a) [allowing "reasonable expenses incurred in making that proof, including reasonable

19

attorney's fees"].)  The trial court properly concluded $90,000 was a reasonable attorney fee and more would not be allowed.  That conclusion applies here as well.

The Kartons criticize the trial court's decision to confine liability for attorney fees to Ari as an entity and not to extend the obligation individually to Messika, Guttman, and Toledano.  This decision turned on an interpretation on the amended judgment, which we have examined.  The court's statement of decision ruled Messika, Guttman, and Toledano were not alter egos of Ari.  The trial court's interpretation of the amended judgment is reasonable.  We accept it.

In conclusion, it was not an abuse of discretion for the trial court to limit the attorney fee award in this case to $90,000.

### III

Separate from the size of the fee award is the question who must pay it.  On this issue the Kartons are right:  the trial court should have extended liability for attorney fees to Ari's surety, which is Wesco.  The trial court incorrectly reasoned no statute or contract provided for fees against Wesco.  The Kartons properly disagree, for their attorney fees are recoverable as costs under section 1029.8 of the Code of Civil Procedure.  We reverse this aspect of the court's order.  Wesco is liable for the $90,000 fee as a cost of litigation.

As Wesco concedes, we independently review this question of law.  (*McKinnon v. Otis Elevator Co.* (2007) 149 Cal.App.4th 1125, 1129.)

The facts about this surety situation are undisputed.  Sections 7071.5 and 7071.6 of the Business and Professions Code required contractors like Ari to procure a contractor's bond.  Before becoming involved with the Kartons, Ari complied with

20

this law by buying a $12,500 surety bond from Wesco.  (At that time, the statute required the bond to be for $12,500; later the Legislature increased this sum.)  When the Kartons sued Ari, their complaint stated a claim against Wesco and its $12,500 surety bond.  Rather than interplead these funds, Wesco tendered its defense to Ari's lawyers.  In other words, Wesco decided to fight the Kartons rather than pay them.  After the court entered judgment against Ari and the Kartons filed their bill of costs, Wesco sent the Kartons a check for $38,768.49, which was the sum of the $12,500, of certain litigation costs, and of postjudgment interest.  This sum excluded attorney fees, which the Kartons said Wesco had to pay as a litigation cost.  The Kartons acknowledged Wesco's $38,768.49 payment but reserved their claim that the proper cost figure should include attorney fees.  The trial court ruled for Wesco and exempted it from liability for the $90,000 attorney fee award.

This trial court ruling was error that ran contrary to precedent, which supports the Kartons.  The crucial concept is that, by statute, the surety's liability is commensurate with its principal, and here an underlying statute made Ari liable to the Kartons for reasonable attorney fees.

The main case is *Pierce v. Western Surety Co.* (2012) 207 Cal.App.4th 83 (*Pierce*).  *Pierce* dealt with surety bonds, albeit for car dealerships and not construction contractors.  (*Id.* at p. 86.) *Pierce* surveyed general surety law, including cases involving construction bonds.  (See *id.* at p. 89 [reviewing *Boliver v. Surety Co.* (1977) 72 Cal.App.3d Supp. 22 and *T&R Painting Construction, Inc. v. St. Paul Fire & Marine Ins. Co.* (1994) 23 Cal.App.4th 738].)  *Pierce* held that the principal's conduct violated the Consumers Legal Remedies Act (Civ. Code, § 1750 et

21

seq.) and this Act provided for attorney fees for prevailing plaintiffs. (*Pierce*, at p. 92 [referring to Civ. Code, § 1780, subd. (e)].) The surety's obligation to pay costs under Code of Civil Procedure section 1032 was based on its status as a litigant and was not for breach of the condition of the bond. (*Pierce*, at p. 92.) The *Pierce* decision affirmed the award of attorney fees as an item of costs that was not limited by a statutory cap on damages. (*Id.* at p. 93.)

The *Pierce* decision mandates victory for the Kartons against Wesco, as follows. A prevailing party is entitled to costs incurred in pursuing the claim. (Code Civ. Proc., § 1032, subd. (b).) When authorized by statute, attorney fees are allowable as costs. (Code Civ. Proc., § 1033.5, subd. (a)(10).) Under Civil Code section 2808, a surety's liability is commensurate with that of the principal within the express terms of the bond and of pertinent statutes. If the principal would have been liable for attorney fees based on conduct secured by the bond, the surety also is liable for the attorney fees as a cost item. (*Pierce*, *supra*, 207 Cal.App.4th at pp. 92–93.)

Wesco was a surety, as it readily agrees. Wesco's liability therefore is commensurate with that of its principal Ari. By operation of section 1029.8 of the Code of Civil Procedure, *Ari* is liable to the Kartons for reasonable attorney fees of $90,000, as we have described. Under *Pierce*, then, so too is *Wesco* liable to the Kartons for reasonable attorney fees of $90,000 as a cost item.

Wesco does not attack *Pierce* as wrongly decided. Rather, with a single paragraph, Wesco attempts to distinguish *Pierce*. Wesco writes, "*Pierce* is distinguishable because in that case there was an underlying statute (the Song-Beverly Consumer

Warranty Act) which had an attorney fee provision applicable to the terms of the bond. That is not the case here."

Wesco's effort to distinguish *Pierce* founders because there indeed *is* an underlying statute with an attorney fee provision: section 1029.8 of the Code of Civil Procedure. The Kartons rely on this statute in their opening papers. Wesco ignores this statute when attempting to distinguish *Pierce*, and thereby effectively concedes the point: Wesco is liable for the Kartons' $90,000 in attorney fees as a cost item, according to the analysis in *Pierce*.

Wesco protests its liability cannot exceed its bond amount and thus is limited to $12,500, which it already had paid. Wesco says this follows under the so-called "*Hartford* rule." (See *Harris v. Northwestern Nat. Ins. Co.* (1992) 6 Cal.App.4th 1061, 1067–1068 (*Harris*) [citing *Hartford Accident and Indemnity Co. v. I.A.C.* (1932) 216 Cal. 40, 50, which in turn cites *Hartford Fire Ins. Co. v. Casey* (Mo.Ct.App. 1917) 191 S.W. 1072, 1076].) According to the precedent Wesco itself cites, however, the *Hartford* rule is consistent with Wesco's obligation to pay *costs* that are not limited by the amount of its bond. (*Harris*, at p. 1068.) The Kartons' attorney fee qualifies as a cost Wesco is responsible to pay as a cost of its litigation. (*Pierce, supra*, 207 Cal.App.4th at pp. 92–93.)

The Supreme Court quoted *Harris* approvingly and in a pertinent way. (See *Pilimai v. Farmers Ins. Exchange Co.* (2006) 39 Cal.4th 133, 144–145 [" 'As a losing party litigant, appellant is properly subjected to costs in addition to the amount of the bond.' (*Harris, supra*, 6 Cal.App.4th at pp. 1065–1066.)"].)

Wesco's actions belie its argument. Wesco says it cannot be liable for more than the $12,500 sum of its bond. Yet it

23

voluntarily wrote the Kartons a check for $38,768.49, which was the sum of the $12,500, plus postjudgment interest, and plus *costs*. When a surety decides to fight a lawsuit, it can make itself liable for the costs of that litigation in excess of the face value of its bond, as Wesco's own actions demonstrate.

Wesco protests that it violates public policy to make it liable for attorney fees. Wesco says public policy favors low insurance premiums, and that to increase its liability would mean higher insurance rates.

This argument runs afoul of case law, which explains that, to avoid the costs and risks of litigation, Wesco could have negotiated settlement of its own liability or used interpleader procedures to deposit the amount of its bond in court. (*Harris*, *supra*, 6 Cal.App.4th at p. 1066.) Instead, Wesco elected to gamble that it and Ari could avoid liability altogether on the merits. "Having lost that gamble, [Wesco] is not in a position to complain about liability for court costs . . . ." (*Ibid.*)

Wesco has not answered this argument. In their opening papers, the Kartons quote this portion of *Harris* concerning Wesco's interpleader option. Wesco does not respond; the word "interpleader" does not appear in Wesco's brief. We infer Wesco has not answered because it cannot. This dispatches its public policy argument. If Wesco wished to avoid the open-ended costs of litigation, it could have done what it avoided doing here: interplead its $12,500 principal and minimize its liability for litigation costs.

After receiving our tentative ruling, Wesco attempted during oral argument to launch a new argument about interpleader. Wesco's failure to brief its interpleader argument

24

forfeited it.  (*Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215, 226.)

Wesco argues the trial court lacked jurisdiction to determine whether Ari was licensed because the Contractors State License Board has exclusive jurisdiction over this question. Wesco neglects the statute at issue, which vests jurisdiction "in any *court* of competent jurisdiction . . . ."  (Bus. & Prof. Code, § 7031, subd. (b), italics added.)  This statutory grant of jurisdiction refutes Wesco's argument.

## DISPOSITION

We reverse the trial court's ruling exempting Wesco from liability for the $90,000 attorney fee award.  We otherwise affirm the order and we remand the case for further proceedings.  Ari, Guttman, Toledano, and Messika are to recover their costs on appeal from the Kartons.  The Kartons and Wesco shall bear their own costs.


WILEY, J.


We concur:


BIGELOW, P. J.



GRIMES, J.


25