Filed 11/20/23  ROIC Cypress West v. Lu CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ROIC CYPRESS WEST, LLC, | |
| Plaintiff and Respondent, | G060750, G061306 |
| v. | (Super. Ct. No. 30-2019-01103254) |
| XIAO FENG LU et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment and postjudgment order of the Superior Court of Orange County, James L. Crandall, Judge.  Affirmed.

NT Law and Julie N. Nong for Defendants and Appellants.

Kimball, Tirey & St. John, Abel Ortiz, Aydin Emami and Scott Andrews for Plaintiff and Respondent.

\*      \*      \*

Commercial tenants Xiao Feng Lu and Xiao Juan Xing (collectively, Tenants) appeal from a judgment and a postjudgment attorney-fee award in favor of their

landlord ROIC Cypress West, LLC (Cypress West or Landlord) for nonpayment of rent. Tenants raise a litany of reasons why Landlord should have lost at trial, including unclean hands, equitable estoppel, lack of mutual consent, waiver, unconscionability, failure to mitigate damages, offset, discovery misconduct, and judicial bias. They also complain the fee award was excessive. We affirm.

## FACTS

In 2009, Tenants leased restaurant space in a shopping center owned by H.R. Barros-Cypress Limited Partnership (H.R. Barros). The lease provided for a five-year term, commencing on May 1, 2009, with one five-year option "exercisable upon at least six (6) months notice [*sic*] before the expiration term." Tenants agreed to pay rent of $4,220 and common area maintenance (CAM) fees of $1,147.84 monthly, with rental increases starting in the third year.

In 2012, H.R. Barros sold the shopping center and assigned Tenants' lease to Cypress West. Cypress West is owned by Retail Opportunity Investment Corp. (ROIC), and the shopping center is managed by ROIC employees.

On February 5, 2014, ROIC's real estate manager, Courtney Pease, e-mailed Lu about the lease. Pease wrote, "[A]re you planning on renewing you [*sic*] lease and staying? Let me know asap since you have missed your notice date."

Two months later, Pease sent Lu another e-mail, with the subject line "Renewal." She wrote, "Please see attached renewal. Please print, sign and mail me two copies." The attachment was a document titled "First Amendment to Lease." Among other things, the amendment recited that the parties "desire[d] to modify" the original lease; provided for a 10-year extension beginning August 1, 2014 and ending July 31, 2024; increased the monthly rent to $5,064 beginning August 1, 2014, with annual rental increases; and added an administrative fee equal to 10 percent of Tenants' pro rata share of the CAM expenses and other costs. Without reading the amendment, Lu signed and returned it to Landlord.

2

In July 2019, Tenants vacated the premises and stopped paying rent. On October 2, after serving Tenants with a notice of abandonment, Landlord regained possession of the premises. A week later, Landlord sued Tenants for breach of lease. Eighteen months after that, Landlord re-rented the premises to an entity operating a walk-in medical care center.

At a one-day bench trial, Pease testified that the increased monthly rent in the amendment was based on what ROIC's executives and leasing representative believed the market would bear. As for the term length, Pease believed there may have been a discussion about it because she typically would not have inserted a 10-year term unless the tenant requested it. ROIC's leasing representative, Courtney Brodie, testified that five years is typical, term length is "typically tenant-driven," and ROIC might accept lower monthly rent in exchange for a 10-year term.

To support its claim of damages, Landlord produced a lease ledger containing a complete history of the debits and credits for the lease (trial exhibit 7). Pease testified that Tenants owed the following amounts: $12,293.65 for the balance on the lease as of October 2, 2019 (when Landlord regained possession); monthly rent of $5,870.56 from November 1, 2019 to July 1, 2020; monthly rent of $6,046.84 from August 1, 2020 to December 1, 2021; monthly CAM charges of $3,606.84 from November 1, 2019 to December 1, 2021; $80,000 for the construction manager overseeing the preparation of the premises for a new tenant; $73,250 for the tenant improvement allowance; and $24,524.10 in lease commissions for an outside broker. Tenants received a rent credit of $6,228.08 and CAM fee credit of $601.14, based on what the new tenant had paid for the month of December 2021.

Lu testified that he moved to the United States in 1995 and his primary language was Chinese. He described his experience leasing the premises from H.R. Barros. He met the agent in person, negotiated the lease terms including rent and CAM charge, and eventually signed the lease in front of the agent, who explained the terms and

3

pointed out sections he and his wife, Xing, were to initial. Xing also read the lease and explained the terms to him in Chinese.

Lu testified to a different experience with Cypress West. When he received Pease's e-mail about the renewal, he didn't speak to anyone from ROIC or Cypress West. He didn't read the document he was asked to sign; he simply signed it because he was asked to. This time, Xing didn't go over the terms of the amendment with Lu because he hadn't asked her to. Xing signed the document because Lu told her to sign it.

Lu thought by signing he was renewing the original lease with the same terms for five more years. Each year when he received notice of a rent increase, he paid it without verifying the figure. Lu considered a landlord to be a "very important person . . . a trust person." When they vacated the premises, Lu thought they had completed their five-year lease option. It wasn't until Cypress West sued him that he learned about the 10-year term in the amendment.

Real estate broker James Crossland testified as an expert on behalf of Tenants. He gave three opinions. First, Landlord should have been able to lease the premises within 7–15 months and thus improperly charged Tenants for 28 months of rent. Second, Tenants should have received a rental credit of $4,867.81. Third, Landlord overcharged rent by $24,734.

The trial court found in favor of Landlord and against Tenants, jointly and severally, in the amount of $366,591.14. This figure represented $262,067.04 in unpaid rent and CAM fees, $80,000 for cleanup and reconfiguration of the premises for re-renting, and a $24,524 broker commission. The court did not award $73,250 for the tenant improvement allowance. The court found that Pease and Brodie were credible and defense expert's testimony was "simply not persuasive." Tenants timely appealed.

The trial court later granted Landlord's motion to be determined prevailing party under the lease and awarded it attorney fees of $44,305.50, the full amount

4

requested, plus costs. Tenants timely appealed that ruling. At Tenants' request, this court consolidated the two appeals.

## DISCUSSION

Tenants argue: (1) the doctrine of unclean hands barred Landlord's recovery of damages; (2) equitable estoppel also barred recovery; (3) there was a lack of mutual consent to the amendment; (4) Landlord waived the requirement that Tenants timely exercise their option to renew; (5) the amendment was unconscionable; (6) Landlord failed to mitigate damages; (7) Tenants were entitled to an offset; (8) Landlord should have been barred from claiming damages due to its discovery misconduct; (9) the trial court was biased against Tenants; and (10) the attorney-fee award was excessive. We address Tenants' claims in turn, grouping the first three claims together.

I.      *Unclean Hands, Equitable Estoppel, and Lack of Mutual Consent*

Tenants complain that Landlord e-mailed them a "renewal" without negotiating with Tenants or explaining the changes to them. This alleged misconduct is the linchpin of Tenants' defenses of unclean hands, equitable estoppel, and lack of mutual consent. The defenses fail for the same reason: There was nothing wrong with Landlord's conduct.

"The unclean hands doctrine protects judicial integrity and promotes justice. It protects judicial integrity because allowing a plaintiff with unclean hands to recover in an action creates doubts as to the justice provided by the judicial system. . . . The doctrine promotes justice by making a plaintiff answer for his [or her] own misconduct in the action. It prevents 'a wrongdoer from enjoying the fruits of his [or her] transgression.'" (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978 (*Kendall-Jackson*).)

The defendant bears the burden of proof on this defense. (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 284 (*Brown*) ["unclean hands is a defense"]; *Seltzer v.*

5

*Barnes* (2010) 182 Cal.App.4th 953, 969 [defendants bear the burden of proof on defenses].) Courts apply "a three-pronged test to determine the effect to be given to the plaintiff's unclean hands conduct. Whether the particular misconduct is a bar to the alleged claim for relief depends on (1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries." (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 979.)

We need not decide the precise standard of review that governs the defense of unclean hands. (*Brown*, *supra*, 192 Cal.App.4th at pp. 274–275 [noting differences among various appellate courts].) Regardless of which standard applies (see *ibid.*), we conclude the trial court did not err in rejecting the defense.

The second prong, which examines "the nature of the misconduct," requires "conduct that violates conscience, or good faith, or other equitable standards of conduct . . . to invoke the doctrine." (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 979.) Tenants have not alleged any such misconduct. Although Landlord did not negotiate the terms of the lease amendment, Lu acknowledged he didn't try to negotiate, either. Tenants do not cite, nor are we aware of, any authority requiring a landlord to discuss terms before presenting a lease to the renter to sign. To the contrary, "'[n]o law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract.'" (*Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1674.) "[A] garden variety landlord-tenant relationship in a commercial setting," like the one here, does not create a fiduciary duty. (*Girard v. Delta Towers Joint Ventura* (1993) 20 Cal.App.4th 1741, 1749.) A party relying on an alleged misrepresentation acts unreasonably when he or she "'could have ascertained the truth through the exercise of reasonable diligence. [Citation.] Reasonable diligence requires the reading of a contract before signing it. A party cannot use his [or her] own lack of diligence to avoid an . . . agreement.'" (*Brookwood*, at p. 1674.)

6

For the same reason, the defense of equitable estoppel does not apply. To apply, the party asserting the estoppel must have reasonably and detrimentally relied upon conduct of the party to be estopped. (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261.) It simply was not reasonable for Lu to forgo reviewing the amendment and instead rely on Pease's description of a "renewal" to mean that no terms had changed.

Finally, "[m]utual assent to contract is based upon objective and outward manifestations of the parties; a party's 'subjective intent, or subjective consent, therefore is irrelevant.'" (*Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1587.) By signing the amendment, Tenants objectively and outwardly manifested their assent to the new lease terms. And because they chose not to read the amendment, they may not claim justifiable reliance on Pease's alleged misrepresentation of a "renewal" with unchanged terms. (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1183, fn. 11 [party's misrepresentations of writing do not negate other side's "'apparent manifestation of assent, if the second party had "reasonable opportunity to know of the character or essential terms of the proposed contract"'"].)

II.      *Waiver of Six-Month Deadline to Exercise Option*

The original lease allowed Tenants to extend the term for five years, provided they exercise the option at least six months before the original term was set to expire. According to Landlord, Tenants failed to exercise the option outside this timeframe, so the option expired. Tenants argue that Landlord waived the six-month requirement because it offered to "renew" the lease, which meant a renewal under the same terms of the original lease, pursuant to Civil Code section 1945 (Section 1945). We are not persuaded.

Section 1945 provides that when a lessee remains in possession after the expiration of a lease and the landlord accepts payment of rent, the parties are presumed to

7

have renewed the lease "on the same terms," but on a month-to-month basis. "[S]ection 1945, which was enacted in 1872, states the widely held rule that a landlord who consents to his tenant's holding over after the expiration of the lease *without making a new agreement* is bound by the terms of the original lease." (*City v. Hart* (1985) 175 Cal.App.3d 92, 94–95, italics added.) In other words, a binding modification of the lease overrides this presumption. (*Miller v. Stults* (1956) 143 Cal.App.2d 592, 598.) Thus, because the parties here executed a written amendment to the lease, the presumption under Section 1945 does not apply.

III.    *Unconscionability*

Tenants argue the amendment is unconscionable because (1) it was a contract of adhesion and they had no choice but to sign or lose their business location; (2) Landlord had the superior bargaining strength; (3) the amendment contained oppressive terms; (4) the new terms weren't explained to them; and (5) Pease misrepresented the amendment as a "renewal." Not so.

Although unconscionability ultimately is a question of law, to the extent there is evidence extrinsic to the contract that is conflicting or that poses conflicting inferences, a trial court's findings will be upheld if supported by substantial evidence. (*Patterson v. ITT Consumer Financial Corp.* (1993) 14 Cal.App.4th 1659, 1663.) Otherwise, this court reviews the contract de novo. (*Ibid.*)

"A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party. . . . [The] doctrine '"has both a procedural and a substantive element."' [Citation.] 'The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. [Citations.] Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.'" (*OTO L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125 (*OTO*).) "Both procedural and

8

substantive unconscionability must be shown for the defense to be established, but 'they need not be present in the same degree.'" (*Ibid.*) "[T]hey are evaluated on '"a sliding scale."'" (*Ibid.*)

In this case, we conclude Tenants have not shown the execution of the amendment involved any degree of procedural unconscionability. "A procedural unconscionability analysis 'begins with an inquiry into whether the contract is one of adhesion.' [Citation.] An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.'" (*OTO*, *supra*, 8 Cal.5th at p. 126.) At trial, Pease testified that "the negotiation process was open; we were open to negotiations" and that Lu "had every right to negotiate with me." Lu, however, admitted he didn't attempt to negotiate or read the amendment. On these facts, there was substantial evidence to support the trial court's finding that "this was an arms-length business deal, by people who were both business people" and that there was no basis for this defense. Due to the lack of procedural unconscionability, we need not address the substantive unconscionability element.

IV.     *Failure to Mitigate Damages*

Tenants contend Landlord failed to mitigate its damages by taking too long to re-rent the premises. We construe this to mean that Tenants are challenging the sufficiency of the evidence to support a finding that Landlord reasonably mitigated its damages. As so construed, we disagree.

A tenant's "abandonment of the premises [before the lease term expires] results in de facto termination of the lease" and enables the landlord to sue for unpaid rent. (*Lu v. Grewal* (2005) 130 Cal.App.4th 841, 848 (*Lu*); Civ. Code, § 1951.2, subd. (a).) The landlord "may recover damages only to the extent unpaid rent exceeds 'the amount of such rental loss that the [tenant] proves could have been reasonably avoided.' [Citation.]" (*Lu*, at p. 849.) "'The duty to mitigate the damages will often require that the property be relet at a rent that is more or less than the rent provided in the

9

original lease. The test in each case is whether the lessor acted reasonably and in good faith in reletting the property.' [Citation.]" (*Id.* at 850.) The landlord "is also entitled to any other damages caused by the breach." (*Ibid.*) For example, to the extent a landlord would not have incurred such costs had a tenant performed under the lease, the landlord would be "entitled to reasonable expenses in retaking possession of the property, in making repairs [the tenant was] obligated to make, [and] in preparing the property for reletting." (*Ibid.*)

The tenant bears the burden of proving failure to mitigate. (*Lu*, *supra*, 130 Cal.App.4th at pp. 849–850.) "Whether a plaintiff acted reasonably to mitigate damages . . . is a factual matter to be determined by the trier of fact, and is reviewed under the substantial evidence test." (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp., U.S.A.* (2013) 221 Cal.App.4th 867, 884.)

At the outset, we note that Tenants were obligated to set forth in their brief *all* the material evidence on the issue of mitigation of damages, not merely their own evidence. (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1657–1659.) Having failed to present, discuss, and analyze all the evidence on that point, Tenants have forfeited, or waived, any claim that the evidence was insufficient to support a finding of reasonable mitigation. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [error deemed waived].)

In any event, we conclude the evidence was sufficient on the issue of mitigation. According to leasing representative Brodie, ROIC listed the premises for rent on its internal website[1] and Loop Net, a website that was "pretty industry standard for listings," and tracked listings weekly. Brodie also "marketed it [the premises] in various other ways," including "door knocking" (dropping off flyers), cold calling, speaking to

---

[1] However, a website printout with a print date of May 4, 2020, did not show Tenants' premises as being available to rent.

the local tenant base, trying to sign up tenants at industry conferences, and speaking to brokers.

Brodie testified that the premises was harder to lease, for three reasons. First, it was about 3,000 square feet, typically too small for a larger format restaurant of at least 5,000 square feet, yet too big for a fast-casual restaurant like Chipotle, which is about 2,400 square feet or smaller. Second, due to the pandemic, there was less interest in restaurant space, and the premises didn't have an unenclosed outdoor patio. Third, the premises was situated in a less visible "in-line space," instead of an end cap or pad location, and thus was less desirable. The court noted that Tenants' expert testified the premises could have been re-rented earlier, but the court was unpersuaded and found Brodie more credible.

V.     *Offset*

Tenants argue they are entitled to offset because Landlord overcharged them on rent. Their briefing, however, does not identify the specific overcharges or explain why the amounts were improper. "The party 'seeking an offset against a money judgment has the burden of proving the offset.'" (*David S. Karton, a Law Corp. v. Musick, Peeler Garrett LLP* (2022) 83 Cal.App.5th 1027, 1040; Evid. Code, § 500.) We review the denial of offset for abuse of discretion. (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 762–763.) Tenants do not meet their burden on appeal by citing to the trial testimony of their expert witness and essentially asking this court to figure out how the trial court abused its discretion in rejecting the expert's opinions. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 (*Jameson*) [appellant's burden to show error justifying reversal].)

VI.    *Discovery Conduct*

Tenants complain they sought discovery of Landlord's profit-and-loss statements and "financial documents," which Landlord refused to produce on privilege

11

grounds but ultimately offered at trial.[2]  Tenants, however, do not contend they moved to compel further responses to the requests.  (Code Civ. Proc., § 2031.310, subd. (a)(3) [motion to compel responses to inspection demand due to meritless or general objections]).  Absent such a motion, Landlord "had no obligation to produce further documents responsive to the demand."  (*New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1428.)

If a party fails to seek an order compelling discovery, a trial court may nonetheless exercise its discretion to exclude evidence at trial "where the misconduct is 'sufficiently egregious' or 'where it is reasonably clear that obtaining such an order would be futile' [citation].'"  (*Cottini v. Enloe Medical Center* (2014) 226 Cal.App.4th 401, 427–428.)  To the extent Tenants are arguing the trial court abused its discretion in admitting Landlord's financial documents, they do not specifically identify which trial exhibits should have been excluded.  Tenants propounded discovery asking Landlord to produce all documents, including "spreadsheet and financial statements reflecting" its gross income and net income from 2010 to the present, and "profit and loss statements from 2010 to present."  Landlord objected that the requested documents were irrelevant and represented confidential financial or trade secret information.  No statements reflecting gross or net income and no profit-and-loss statements were admitted at trial.  Although Landlord introduced a lease ledger showing credits and debits for the premises, it was not responsive to the identified discovery requests.  Based on these facts, Tenants have not shown any abuse of discretion.

VII.  *Judicial Bias*

Tenants argue that based on the totality of circumstances the trial judge exhibited clear bias against them due to their Chinese heritage and limited English skills.

---

[2]      Tenants also argue they asked for documents of Landlord's claim for damages, but cite only to Landlord's responses to requests for *admission*.  Needless to say, a party responding to requests for admission need not produce any documents.

12

They allege the judge failed to consider Landlord's discovery responses, including its admission it had no evidence to support its damages; disregarded Tenants' testimonies; rushed through trial in fewer than eight hours to avoid preparing a written decision; and allowed Pease and Brodie to testify even though they weren't employees of Cypress West. Having reviewed the entire record, we disagree.

"Although 'the trial court has both the duty and the discretion to control the conduct of the trial' [citation], 'the Due Process Clause clearly requires a "fair trial in a fair tribunal," [citation], before a judge with no actual bias against the defendant or interest in the outcome of his particular case. [Citations.]'" (*People v. Harris* (2005) 37 Cal.4th 310, 346 (*Harris*).) "[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist '"the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable."'" (*People v. Freeman* (2010) 47 Cal.4th 993, 996.)

"The role of a reviewing court 'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid." (*Harris*, *supra*, 37 Cal.4th at p. 347.) Instead, "we assess whether any judicial misconduct or bias was so prejudicial that it deprived defendant of '"a fair, as opposed to a perfect, trial."'" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112.) "We review claims of judicial misconduct under the de novo standard and on the basis of the entire record." (*People v. Williams* (2021) 60 Cal.App.5th 191, 202.)

Here, there is simply no evidence to suggest the trial court was biased against Tenants. When announcing its decision, the trial court noted: "[W]e have two immigrant defendants pursuing the American dream. Come to the country, not speaking English. Learning their language. Opening a restaurant." The court called Tenants "the emotional favorite, in the heart of any person." The court explained that it had to decide

13

the case based on the law and "can't root for somebody because of what they look like or where they come from." These comments expressed the court's sympathy for Tenants' situation. At the same time, they directly responded to Tenants' claim that that they should be excused from the consequences of signing a lease due to their limited English and trust in their landlord.

Tenants' remaining complaints are equally unpersuasive. As we have discussed previously, Tenants have not shown any discovery misconduct by Landlord. In any event, "a judge's 'rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review.'" (*People v. Armstrong* (2019) 6 Cal.5th 735, 798.) As the trier-of-fact, the trial court must weigh the credibility of witnesses and can, when appropriate, disregard testimony. That Pease and Brodie were employed by ROIC, and not Cypress West, is of no moment; they were key witnesses to the events giving rise to this action. Finally, the court has the inherent authority to control trial. (*People v. Snow* (2003) 30 Cal.4th 43, 78, 79.) Having reviewed the record, we conclude that the court did not rush the parties through trial.

VIII. *Attorney Fees*

Tenants challenge the trial court's attorney-fee award of $44,305.50. They argue it was excessive because the partner hourly rates were too high, some billing entries were already included in the damage calculation, and one attorney overbilled by 16 hours. We address–and reject–each argument below.

We review an award of attorney fees for abuse of discretion. (*Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 488.) "'The "experienced trial judge is the best judge of the value of professional services rendered in his [or her] court, and while his [or her] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong."'" (*Ibid.*)

First, the trial court fixed the hourly rate for partners at $395. Although Tenants contend the rate should have been reduced to $320, they fail to show $395 was

14

unreasonable. "The reasonable hourly rate is that prevailing in the community for similar work." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.) To urge the court to adopt the lower rate, Tenants submitted three website printouts: (1) from deen-law.com, in which a San Diego lawyer quoted his "standard hourly rate" of $320; (2) from Clio.com stating the average hourly rate for California lawyers practicing "[c]ontracts" was $307; and (3) from sandiegoevictions.com listing "sample fees," including flat fees of $230 to "prepare an unlawful detainer" and $350 for a half-day of trial. The trial court, however, acted within its discretion in casting aside these rates— none of which speak to the prevailing attorney rate in Orange County. (*Nishiki v. Danko Meredith, P.C.* (2018) 25 Cal.App.5th 883, 898 [rates "'in the forum district'" usually used].)

Second, Tenants claim they were double charged for certain hours because those amounts appear in both the "damages ledger" and the fee motion. Not so. Although the lease ledger (trial exhibit 7) listed amounts owed on attorney invoices, those amounts were neither requested by Landlord, nor awarded by the trial court, as damages. Landlord recovered damages for only unpaid rent, CAM fees, expenses for cleanup and reconfiguration of the premises for re-renting, and a broker commission.

Third, Tenants complain of excessive hours billed by the lead attorney. Objecting to five billing entries, they seek a 16-hour reduction. However, the appellate record on this issue is incomplete. It contains the notice of motion for attorney fees, but not the supporting memorandum of points and authorities or the attorney declaration, which presumably contain evidence of the billing entries. Without the complete moving papers, we cannot meaningfully review this issue. (*Jameson*, *supra*, 5 Cal.5th at p. 609 [""""if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed"""]; *Rancho Santa Fe Assn. v. Dolan-King* (2004) 115 Cal.App.4th 28, 46 [where appellant provided order granting an attorney-fee award and not moving and opposing papers, "proper course is to uphold the award"].)

15

## DISPOSITION

The judgment and postjudgment order are affirmed.  Respondent shall recover costs on appeal.

DELANEY, J.

WE CONCUR:

MOORE, ACTING P. J.

GOETHALS, J.

16